UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                :
AMERICAN BIRD CONSERVANCY, *et* :
*al.*,                          :
                                :
        Plaintiffs,             :        Civil Action No. 06-2641 (JAP)
                                :
            v.                  :        **OPINION**
                                :
DIRK KEMPTHORNE, *et al.*,      :
                                :
                                :
        Defendants.             :
_____:

Appearances:

JULIA L. HUFF, ESQ.
CARTER H. STRICKLAND, JR., ESQ.
Rutgers Environmental Law Clinic
123 Washington Street
Newark, New Jersey 07102-3094

JASON C. RYLANDER, ESQ.
MICHAEL P. SENATORE, ESQ.
Defenders of Wildlife
1130 17th Street, NW
Washington, D.C. 20036

*Attorneys for Plaintiffs*

CHRISTOPHER J. CHRISTIE, United States Attorney
SUSAN HANDLER-MENAHEM, Assistant United States Attorney
970 Broad Street, 7th Floor
Newark, NJ 07012

SUE ELLEN WOOLDRIDGE, Assistant Attorney General
JEAN E. WILLIAMS, Chief
LISA LYNNE RUSSELL, Assistant Chief
U.S. Department of Justice, Environment and Natural Resources Division
Wildlife and Marine Resources Section

LAWSON E. FITE, Trial Attorney
KRISTEN BYRNES FLOOM, Trial Attorney
P.O. Box 7369
Washington, D.C. 20044-7369

*Attorneys for Defendants*

PISANO, District Judge.

Currently before the Court is a motion by defendants, Dirk Kempthorne, Secretary of the United States Department of the Interior, and H. Dale Hall, Director of the United States Fish and Wildlife Service (collectively, "Defendants"), for judgment on the pleadings and to dismiss for lack of jurisdiction.  Defendants seek dismissal of Plaintiffs' Amended Complaint, alleging that this Court lacks jurisdiction to review the agency action challenged in this case or, alternatively, that the Plaintiffs' claims are moot.  Because the Court finds that the challenged action is one that is not subject to judicial review under the applicable statutes, Defendants' motion is granted and this matter is dismissed.

## I.  Background

### A.  Factual and Statutory Background

In 1973, Congress enacted the Endangered Species Act, 16 U.S.C. §§ 1531-1544 (the "ESA"), "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  The ESA directs that the Secretary of the Interior ("Secretary")[1] shall "determine whether any species is an endangered species or a threatened species because of any of the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B)

_____

[1]While the responsibility for the administration and enforcement of the ESA with respect to terrestrial and freshwater species lies with the Secretary, the Secretary has delegated the responsibility to the Fish and Wildlife Service ("FWS").  *See* 50 C.F.R. § 402.01(b).

overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence."  16 U.S.C § 1533(a)(1) (these factors are sometimes referred to herein as the "five listing factors").  This determination by the Secretary must be made "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation. . . to protect such species."  16 U.S.C. § 1533(b)(1)(A).

To receive protection under the ESA, a species must be "listed" by Secretary as endangered or threatened.  The determination of whether a given species should be listed as endangered or threatened under the ESA may be made either through the agency-initiated "candidate process" or in response to a citizen petition.  *See* 16 U.S.C. §§ 1533(a)(1),1533(b)(3).  Once a species is listed, the Secretary "shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C.A. § 1533(d).

Under the petition process, any "interested person" may petition to have a species listed as threatened or endangered. 16 U.S.C. § 1533(b)(3)(A).  Pursuant to the ESA, within 90 days after receiving a citizen petition (to the "maximum extent practicable"), the Secretary must determine whether the petition presents "substantial scientific or commercial information" such that the petitioned action may be warranted. *Id.*  This is generally referred to as a "90-day finding."  If it is found that listing is not warranted,  the listing process ends

4

for that species.  However, if the Secretary finds that listing may be warranted, then further review of the species' is conducted.  *Id.*  This review must be completed within 12 months of receiving the petition (generally known as a "12-month finding") and must state whether the petition action is (1) warranted, (2) not warranted, or (3) warranted but precluded by other listing activity.  16 U.S.C. § 1533(b)(3)(B).  To make a "warranted but precluded" finding, the Secretary must conclude that the petitioned action is warranted, but that immediate listing is precluded by pending listing proposals and that "expeditious progress" is being made to address pending listing proposals. 16 U.S.C. 1533(b)(3)(B)(iii).  If a "warranted but precluded" finding is made, the agency must publish the finding in the Federal Register along with a "description and evaluation of the reasons and data on which the finding is based."  *Id.*

Under the normal listing procedure, the Secretary lists a species by promulgating a regulation after undertaking formal rulemaking pursuant to the procedures set forth in the ESA and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*  *See* 16 U.S.C. § 1533(b)(4).  However, in situations where there exists an "emergency posing a significant risk to the well-being of any species of fish or wildlife or plants," the Secretary is given the authority under the ESA to bypass ESA and APA rulemaking procedures and issue regulations, including a listing, that take effect, at the discretion of the Secretary, immediately upon publication in the Federal Register.  16 U.S.C. § 1533(b)(7).  These emergency regulations are temporary in nature and remain in force for only 240 days, although rulemaking pursuant to the standard procedures may conducted during that time to enact further regulations.  *Id.*  In order to issue an emergency regulation, the Secretary must publish

in the Federal Register "detailed reasons why such regulation is necessary" and give actual notice to appropriate state agencies of the regulation. 16 U.S.C. § 1533(b)(7).

In late July and early August 2005, Plaintiffs petitioned the FWS and the Department of the Interior to list the migratory shorebird *Calidris canutus rufa*, commonly known as the "red knot," as "endangered on an emergency basis, and to designate critical habitat in the Delaware Bay ecosystem under the ESA." Compl.[2] at ¶ 6 (internal quotations omitted). The red knot is a medium-sized shorebird that travels each year from wintering grounds in Patagonia and Tierra del Fuego to breeding grounds in the Arctic. *Id.* at ¶ 2. The birds make a stop during this migration in the Delaware Bay area, where they feed on horseshoe crab eggs. According to Plaintiffs' First Amended Complaint ("Complaint"), the population of the red knot has declined over the past 20 years from about 100,000 in the mid-1980's to approximately 13,000 in 2006. *Id.* at ¶ 4.

About four months after Plaintiffs filed their petition, in a letter dated December 22, 2005 (the "December Letter), Defendants denied Plaintiffs' request to list the red knot on an emergency basis. In that regard, the letter from FWS stated as follows:

> While we have not made a decision on whether the petition presents substantial information that the petitioned action may be warranted, we have looked at the immediacy of possible threats to the species to determine if emergency listing may be warranted at this time. Our initial review of your petition, and the information within our files, does not indicate that an emergency situation exists. If at any time the conditions change, and we later determine that an emergency listing is warranted, an emergency rule maybe developed.

* * *

---

[2] The abbreviation "Compl." refers the Amended Complaint filed on August 8, 2006.

6

> However, we will review the petition in the context of a non-emergency,
> through our petition process.

Compl. at Ex. C.

On September 12, 2006, the FWS issued a Candidate Notice of Review ("CNOR").

71 Fed. Register 53,756 (Sept. 12, 2006).  CNORs are published annually by the FWS and

provide information regarding the status of the listing program as a whole and progress that is

being made on the listing backlog.  50 C.F.R. § 424.15(b).  "The CNOR summarizes the

status and threats" for each species.  71 Fed. Reg at 53,756.  Also, each species is assigned a

"listing priority number" from 1 to 12, "depending on the magnitude of threats, imminence of

threats, and taxonomic status."  *Id.* at 53,757.

With respect to the red knot, the September 12, 2006 CNOR noted the "substantial

decline" in the population in recent years:

> At the Delaware Bay area, peak counts between 1982 and 1998 were as high as
> 95,360 knots. Although counts may vary considerably between years, some of
> the population fluctuations can be attributed to predator-prey cycles in the
> breeding grounds, and counts show that knots rebound from such reductions. In
> the past, horseshoe crab eggs were so numerous that a knot could eat enough in
> two to three weeks to double its weight. Research shows that from 1997 to
> 2002 an increasing proportion of red knots leaving the Delaware Bay failed to
> achieve threshold departure masses needed to fly to breeding grounds and
> survive an initial few days of snow cover, and this corresponded to reduced
> annual survival rates. Recently, peak counts at the Delaware Bay area have
> been lower than in the past and do not show a rebound. The peaks were 13,315
> in 2004, 15,345 in 2005, and 13,455 in 2006. Counts in recent years at the
> principal wintering areas in South America also are substantially lower than in
> the past and do not show a rebound.

The report identified several threats to the red knot:

> The primary factor threatening the red knot is destruction and modification of
> its habitat, particularly the reduction in key food resources resulting from

reductions in horseshoe crabs, which are harvested primarily for use as bait and secondarily to support a biomedical industry. . . .Other identified threat factors include habitat destruction due to beach erosion and various shoreline protection and stabilization projects that are impacting areas used by migrating knots for foraging, the inadequacy of existing regulatory mechanisms, human disturbance, and competition with other species for limited food resources. Also, the concentration of red knots in the Delaware Bay area and at a relatively small number of wintering areas make the species vulnerable to potential large-scale events in those areas such as large oil spills or severe weather.

Overall, however, the report concluded that "the threats, in particular the modification of habitat through harvesting of horseshoe crabs to such an extent that it puts the viability of the knot at substantial risk, are of a high magnitude, but are nonimminent because of reductions and restrictions on harvesting horseshoe crabs."  Consequently, the FWS assigned a listing priority number of 6 to the red knot.[3]

B.  Procedural History

Plaintiffs filed this lawsuit on June 13, 2006.  Plaintiffs' Amended Complaint alleges that the December 22, 2005 decision denying "Plaintiffs' emergency listing petitions was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A), and further alleges that Defendants violated the ESA in reaching their decision.  Compl. ¶¶ 109-10, 116-25.  By way of relief, Plaintiff seeks a declaration that Defendants violated the ESA and an order "that Defendants immediately list the Red Knot as

_____

[3]Because the FWS included the red knot in the 2006 CNOR, Plaintiffs have voluntarily dismissed their second claim for relief, which alleged that Defendants had violated the ESA by failing to make a finding as to whether "the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" within 90 days of receipt of a petition to list a species, to the maximum extent practicable, under 16 U.S.C. § 1533(b)(3)(A).

endangered under the ESA, or, in the alternative, an order that Defendants immediately reconsider listing the Red Knot as endangered on an emergency basis." Compl. at 23-24.

Defendants seek dismissal of the instant action under Rules 12(c) and 12(b)(1) of the Federal Rules of Civil Procedure, arguing that the Court does not have jurisdiction to hear Plaintiffs' claims because neither the ESA nor the APA provide a basis for judicial review of the challenged action. Further, Defendants argue that even if the court finds that judicial review is permitted, Plaintiffs claims were rendered moot by the 2006 CNOR. Plaintiffs, on the other hand, assert that their claims are reviewable by this Court pursuant to the APA and, further, that their claims are not rendered moot by the CNOR.

**II. Legal Discussion**

A. Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure allows a party to move for judgment on the pleadings "after the pleadings are closed but within such time as not to delay trial." The applicable standard on a motion for judgment on the pleadings is materially the same standard applied on a motion to dismiss pursuant to Rule 12(b)(6). *See Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004). In reviewing a motion made pursuant to Federal Rule of Civil Procedure 12(c) seeking dismissal on the pleadings, a court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff. *See Gomez v. Toledo*, 446 U.S. 635, 636 n.3, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980); *Robb v. Philadelphia*, 733 F.2d 286, 287 (3d Cir. 1984). Under Rule 12(c) "judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be

resolved and that he is entitled to judgment as a matter of law." *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988) (citation omitted).

B.  Challenged Agency Action

As stated earlier, Plaintiffs' first claim challenges "Defendants' denial of Plaintiffs' emergency listing petitions" as "arbitrary, capricious, and abuse of discretion or otherwise not in accordance with law."  Compl. at ¶ 110.  Next, Plaintiffs allege that Defendants violated the ESA because the Secretary "rel[ied] upon factors other than those prescribed by the ESA in making his determination not to emergency list the Red Knot."  *Id.* at ¶ 120.  Specifically, Plaintiffs refer to the five listing factors in 16 U.S.C. § 1533(a)[4] and allege that the Secretary considered factors beyond their scope when deciding that "an emergency listing was not warranted."  *Id.* at ¶ 117-119.  Last, Plaintiffs allege that Defendants violated the ESA "[i]n failing to rely on the best scientific and commercial data available when deciding not to emergency list the Red Knot."  *Id.* at ¶ 125.  *See* 16 U.S.C. § 1533(b)(1)(A) ("The Secretary shall make determinations required by subsection (a) (1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status

---

[4]  Pursuant to 15 U.S.C. § 1533(a)(1), "[t]he Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.

of the species and after taking into account those efforts . . . to protect such species.")

As already noted, under the ESA any "interested person" may petition the Secretary to add a species to the list of endangered or threatened species.  16 U.S.C. § 1533(b)(3)(A).  Significantly, the ESA has only a single petition process; there is not a separate process for requesting "emergency listings" as opposed to a "non-emergency listing."  *Fund for Animals v. Hogan*, 428 F.3d 1059, 1064 (D.C. Cir. 2005).  However, in responding to a petition, it can be said that the Secretary has more than one rulemaking option when listing a species.  First, the Secretary may follow the standard listing procedure, pursuant to which all of the relevant rulemaking requirements of the ESA and the APA are applicable and are followed from the inception of the rulemaking process.  Alternatively, in situations where the Secretary determines there exists an "emergency posing a significant risk to the well-being of any species," the Secretary may, at least temporarily, bypass the statutory rulemaking requirements and promulgate a listing that takes effect, "at the discretion of the Secretary," immediately upon publication in the Federal Register.  16 U.S.C. § 1533(b)(7).  Because a listing made pursuant to this procedure remains in effect for only 240 days, *id.*, the Secretary must undertake standard rulemaking procedures to list the species on a non-temporary basis.

Plaintiffs in the present case petitioned the Secretary to list the red knot as an endangered species under the ESA.  *See* Compl. at Exs. A, B.  In doing so, Plaintiffs also requested that the agency exercise its "emergency listing" authority in addressing their petitions, that is, Plaintiffs requested that the Secretary address the petition using the "emergency" procedure described above.  *Id.*  Defendants denied the request to invoke the

emergency listing procedure and advised Plaintiffs by way of the December Letter that

Plaintiffs' petition would instead be addressed pursuant to the standard listing process.

Consequently, the agency actions challenged in this case center on the decision by the FWS

not to invoke the "emergency" listing procedure available under § 1533(b)(7), which would

have allowed it to bypass standard rulemaking procedures with respect to listing the red knot.

C.  Judicial Review Under the ESA

Defendants argue that judicial review of the FWS's decision not to invoke the

emergency listing procedure is unavailable under both the ESA and the APA.  Plaintiffs do

not appear to challenge Defendants' argument that the ESA does not provide a basis for

judicial review of their claims.  Rather, in response to Defendants' motion, Plaintiffs assert

that they are seeking judicial review of "a final agency action" under the APA.  *See* Pl. Brf at

9.  Nevertheless, the Court will examine whether the ESA provides a basis for Plaintiffs to

bring their claims, as the APA provision upon which Plaintiffs apparently rely is applicable

only where there is a "final agency action for which there is no other adequate remedy in a

court . . ." 5 U.S.C. § 704.  Consequently, if the ESA provides a basis for judicial review of

Plaintiffs' claims, then the APA would not.  *Accord Bennett v. Spear*, 520 U.S. 154, 160-61,

117 S. Ct. 1154 (1997) ("Although petitioners contend that their claims lie under both the

ESA and APA, we look first at the ESA . . . because the APA by its terms independently

authorizes review only when 'there is no other adequate remedy in a court.'").

As an initial matter, Court notes that there is no express provision in the ESA

authorizing a suit to challenge a determination not to emergency list a species.  Indeed, there

is no language in the ESA that provides for emergency listing petitions, nor are there statutory guidelines instructing the agency in the handling of petitions requesting "emergency" listings that differ from the procedures for handling standard listing petitions.  While the ESA creates a detailed scheme for processing listing petitions, it does not create a procedure for consideration of "emergency listing" petitions apart from other listing petitions.  Being that there is not a separate provision providing for judicial review of emergency listing decisions, the Court must examine the "citizen-suit" provision of the ESA to determine if the ESA authorizes the instant action.

The "citizen-suit" provision of the ESA provides in the relevant part that "any person may commence a civil suit on his own behalf . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary."  16 U.S.C. § 1540(g)(1)(C).[5]  Thus, the central issue with respect to the applicability of the citizen-suit provision in the present case is whether the decision not to invoke the emergency listing procedure is "discretionary with the Secretary."

While the Third Circuit has not addressed the question, one circuit court examining the emergency listing authority in the context of the ESA has noted that "[an emergency] listing is expressly committed to the Secretary's discretion."  *Fund for Animals v. Hogan*, 428 F.3d

_____

[5]Subsection (A) of the citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A), provides that any person may commence a suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof."  While on its face it may appear that this subsection may have some applicability in the present case, the Supreme Court has held that this provision does not apply in the context of alleged failures by the Secretary or other federal officers in performing their duties in administering the ESA. *Bennett*, 520 U.S. at 173-174.

1059, 1064 (D.C. Cir. 2005) (internal quotations omitted).  The *Hogan* court stated as follows:

> Contrary to the Fund's suggestion, the ESA clearly establishes but a single petition process for listing a species as endangered or threatened, see 16 U.S.C. § 1533(b)(3)(A); there is no separate process in the ESA or its implementing regulations for requesting an "emergency listing" as opposed to a "non-emergency" listing. Although § 1533(b)(7) does permit the Secretary to list a species based upon an "emergency posing a significant risk to the well-being of [that] species," **that type of listing is expressly committed to the Secretary's "discretion,"** the exercise of which is not structured by any statutorily prescribed criteria or procedures. The Fund therefore had no statutory right to petition the Secretary for an emergency listing under § 1533(b)(7), and no right to a decision meeting any particular procedural or substantive standards.

*Hogan*, 428 F.3d at 1063-64 (emphasis added).[6]

In addressing an issue similar to the one raised by the present motion, the court in

*Institute For Wildlife Protection v. Norton*, 303 F. Supp.2d 1175 (W.D. Wash. 2003), *aff'd*

149 Fed. Appx. 627 (9th Cir. 2005), found that the ESA did not provide a basis for judicial

review of the FWS's decision not to emergency list a species.  The *Norton* court held that

> [n]othing about the language of this subsection indicates, either directly or indirectly, that the Congress intended that the option of emergency listing was non-discretionary with the Secretary. The conventional hallmarks of a mandatory duty -- *e.g.*, an explicit definition of what circumstances constitute an "emergency," or a definite timeline under which the agency must respond to a request for emergency listing -- are completely missing. . . .[T]he statute contains no guidelines for the Court to determine what the defendants' duties are in responding to an emergency listing request. . . .[T]he context of the entire statutory scheme is that Congress intended the emergency listing mechanism to be an option which the agency could exercise if, in its discretion,

---

[6]As Plaintiffs point out, the Court of Appeals clarified that its opinion in *Hogan* refers to the availability of judicial review under the ESA, and does not "resolve whether plaintiffs may seek to have the denial of an emergency listing request reviewed under the Administrative Procedure Act."  Order filed February 17, 2006 in *Fund For Animals v. Hogan*, No. 03-5077 (9th Cir. 2006).

it determined that the threat to a particular species was emergent.

*Norton*, 303 F. Supp.2d at 1180.

This Court similarly concludes that, based on the statutory scheme of the ESA, Congress intended to leave the decision as to whether to exercise the emergency rulemaking powers -- at least at the outset of the petition review process as in this case[7] -- to the discretion of the Secretary.  While the ESA permits the Secretary to list a species on an emergency basis upon the initial review of a petition, the statute does not, for example, set forth any specific circumstances under which such an emergency listing would be required.  Indeed, the relevant subsection of the ESA, in its entirety, provides that

> Neither paragraph (4), (5), or (6) of this subsection nor section 553 of Title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if--
>
> (A) at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and
>
> (B) in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

_____

[7]In some situations not relevant to the instant motion, the ESA appears to create a non-discretionary duty for the Secretary to invoke his emergency rulemaking authority.  In particular, after a petition has been reviewed and certain required findings made, 16 U.S.C § 1533(b)(3)(C)(iii) provides that "[t]he Secretary shall implement a system to monitor effectively the status of all [warranted but precluded species] and shall make prompt use of the [emergency listing] authority to prevent a significant risk to the well being of any such species."  The Amended Complaint in this case challenges only the December 22, 2005 decision by the Service not to emergency list the red knot, a decision that was made upon "initial review" of the petition and prior to any findings that could invoke § 1533(b)(3)(C)(iii).  Therefore, Plaintiffs' claims here do not arise under that subsection.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

16 U.S.C. § 1533(b)(7)

Again, it is clear that this section permits the Secretary to bypass certain ESA and APA rulemaking requirements when issuing regulations with respect to "any emergency posing a significant risk to the well-being of any species." *Id.* However, it places no mandatory duty upon the Secretary to exercise this "emergency" procedure in any situation. Throughout the ESA, Congress imposes nondiscretionary duties on the Secretary through the use of the word "shall" and, in many cases, by defining clear procedural requirements such as, for example, deadlines. Such things are notably absent from the ESA with respect to the statutory authority to invoke the emergency listing procedure.

Also absent from the statute is the requirement that specific criteria be considered by the Secretary when deciding whether a particular situation warrants emergency rulemaking. Plaintiffs argue to the contrary and point to the five listing factors of § 1533(a) and the "best scientific and commercial data" requirement of § 1533(b)(1)(A). However, these provisions are applicable only in determining "whether any species is an endangered species or a threatened species," § 1533(a)(1). There is nothing in the ESA that limits the Secretary to only those factors when considering the question of whether to exercise emergency rulemaking authority.

In sum, the Court finds that under the present facts, the exercise of the emergency listing authority of 1533(b)(7) was not a mandatory act or duty to be undertaken by the Secretary, but rather an optional procedure to be exercised at the Secretary's discretion. Consequently, the ESA does not provide a basis for the judicial review Plaintiffs seek in this case.

D.  Judicial Review Under the APA

Plaintiffs, apparently conceding that the citizen-suit provision of the ESA has no application in this matter, assert that they are seeking judicial review pursuant to the APA. Generally, the fact that a claim cannot be maintained under the ESA does not necessarily preclude bringing that claim under the APA.  The Supreme Court has noted that "it would not be maintainable . . . that the causes of action against the Secretary set forth in the ESA's citizen-suit provision are exclusive, supplanting those provided by the APA." *Bennett*, 520 U.S. 154, 175, 117 S. Ct. 1154, 137 L. Ed.2d 281 (1997).

Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  Thus, "[w]here no other statute provides a private right of action, the 'agency action' complained of must be "final agency action.'"  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 159 L. Ed. 2d 137, 124 S. Ct. 2373, 2378 (2004).  Generally, two conditions must exist for an agency action to be considered "final."  First, "the action must mark the consummation of the agency's decisionmaking process--it must not be of a merely tentative or interlocutory nature [and] second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520

17

U.S. at 177-78 (internal quotations and citations omitted).

Defendants have not disputed that the challenged action in this case is a "final agency action" for the purposes of the APA.  Given the ultimate disposition of this motion, it is not necessary for the Court to address the issue.  Therefore, the Court assumes without deciding that the challenged action meets this threshold requirement.

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.   However, the APA excepts agency action from judicial review in two circumstances.  *See* 5 U.S.C. § 701(a).  The first is where judicial review is precluded by statute, *see* § 701(a)(1), and the second is where the agency action is "committed to agency discretion by law."  § 701(a)(2).[8]   In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court explained that subsection (a)(1) addresses whether Congress expressed an intent to prohibit judicial review, while subsection (a)(2) applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'"  401 U.S. at 410.  Given this framework, in determining whether the APA applies, a court first looks to whether a statute expressly precludes judicial review, and, if not, must then determine whether the challenged action is committed to agency discretion by law.  *See Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 641 (10th Cir. 1990) (citing *Turner v. United States*

_____

[8]In its entirety, §701(a) reads as follows: "(a) This chapter [5 U.S.C. § 701, *et seq.*, Judicial Review] applies, according to the provisions thereof, except to the extent that–  (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

*Parole Comm'n.*, 810 F.2d 612, 614 (7th Cir.1987).

In the present case, the Court finds no statutory provision that evinces any intent by Congress to preclude judicial review of the agency action challenged in this case, therefore, the exception set forth in § 701(a)(1) does not apply here.  *See Bennett*, 520 U.S. at 175 ("Nothing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so.")  Defendants argue, rather, that the exception in § 701(a)(2) applies to prohibit judicial review because the Secretary's decision whether to exercise the emergency listing authority "is committed to agency discretion by law."  *See id*.  Defendants assert that the present case is one where the "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion" and where "no judicially manageable standards are available for judging how and when an agency should exercise its discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Plaintiffs, on the other hand, argue that judicial review available in this case under the APA.  Plaintiffs point to *Raymond Proffitt Foundation v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 204 (3d. Cir. 2003), which noted that in applying the exception in § 702(a)(2), there exists "a broad presumption in favor of reviewability," and the exception applies "only when there is no law [for a reviewing court] to apply."  Plaintiffs assert that because there exists ample "law to apply" in this case, judicial review is appropriate under the APA.  In particular, Plaintiffs point to the following: (1) the five listing factors set forth in § 1533(a)(1) that are to be evaluated in determining whether a species is "endangered" or "threatened;" (2) the statutory definition of "endangered" set forth in § 1532(6); (3) the "standard" for emergency

19

listings, namely, "any emergency posing a significant risk to the well-being of any species;" *see* 1533(b)(7), and (4) regulations promulgated by the FWS and supplemental guidance documents to inform agency personnel.

In *Proffitt*, the Third Circuit reiterated the analytical framework set out in *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574 (3d Cir.1979) used to evaluate whether an agency decision is unreviewable under § 701(a)(2).  Under this framework, a court is to consider whether:

> 1) the action involves broad discretion, not just the limited discretion inherent in every agency action; 2) the action is the product of political, military, economic, or managerial choices that are not readily subject to judicial review; and 3) the action does not involve charges that the agency lacked jurisdiction, that the decision was motivated by impermissible influences such as bribery or fraud, or that the decision violates a constitutional, statutory, or regulatory command.

*Proffitt*, 343 F.3d at 205.  The parties in this case do not appear to dispute that the first two prongs are met, but focus on that part of the third prong that states "the decision violates a constitutional, statutory or regulatory command."  *See id.*

The Court finds that Plaintiffs simply have not pointed to a "constitutional, statutory or regulatory command" that exists with respect to the challenged agency action in this case.  As discussed above, contrary to the assertions of Plaintiffs, the ESA does not set forth any specific criteria governing the exercise of the Secretary's discretion in choosing whether to invoke "emergency" listing procedures as opposed to following the "normal" listing procedure.  Plaintiffs refer to, for example, that part of § 1533(b)(7) that describes the existence of an "emergency posing a significant risk to the well-being of any species." Plaintiffs characterize in their Complaint the existence of such an "emergency" as a condition

that requires the Secretary to undertake emergency rulemaking.  In fact, pursuant to the plain language of the statute, such an "emergency" is merely a *prerequisite* to the exercise of the Secretary's emergency rulemaking authority, and it does not mandate such an exercise. Similarly, none of the other "law to apply" cited by Plaintiffs governs the agency action that Plaintiffs have challenged in this case.  Consequently, for these reasons as well as the reasons that the Court found the challenged agency action to be discretionary under the ESA, the Court finds that the agency action falls within the "discretion" exception to the APA and, therefore, is not reviewable.

## III.  Conclusion

For the reasons stated above, the Court finds that it lacks subject matter jurisdiction over this matter.  Defendants' motion is granted and this matter is dismissed.  An appropriate Order accompanies this Opinion.

/s/ JOEL A. PISANO
United States District Judge

Dated: October 9, 2007

21